Paul TILLERY, Appellant,

v.

UNITED STATES, Appellee.

Nos. 13444, 79–654.

District of Columbia Court of Appeals.

Argued Feb. 12, 1980.

Decided Sept. 10, 1980.

Justin D. Simon, Washington, D. C., appointed by the court, for appellant.

William J. Bowman, Asst. U. S. Atty., Washington, D. C., with whom Carl S. Rauh, U. S. Atty., Washington, D. C., at the time the brief was filed, John A. Terry and Timothy J. Reardon, III, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee. Regina C. McGranery, Asst. U. S. Atty., Washington, D. C., also entered an appearance for appellee.

Before KELLY, NEBEKER and FERREN, Associate Judges.

KELLY, Associate Judge:

Appellant was convicted by a jury of first–degree murder, D. C. Code 1973, §§ 22–2401, –3202, and carrying a pistol without a license, D. C. Code 1973, § 22–3204. On appeal he argues that the trial judge erred in denying his motion for a new

trial[1] based upon the ineffective assistance of his trial counsel.[2] We agree, reverse his convictions, and remand the case for a new trial.

The facts underlying appellant's murder conviction may be stated very briefly. On August 16, 1976, appellant entered the office of his girlfriend, Brenda Jones, and shot her three times.[3] Hearing the shots, two nearby workers ran to Ms. Jones' office and found appellant, standing motionless and erect, his outstretched hand pointing a gun at Ms. Jones' desk. When the workers went to call the police, appellant left the building unnoticed, got into his car with his brother (who knew nothing about the shooting), and drove silently to the Southwest Freeway. There, his car was stopped by officers from the Federal Protective Service and appellant was arrested.

Appellant's only defense at trial was insanity. The defense theory, presented almost exclusively through lay witnesses, was that appellant, who had undergone a personality change since returning from the Army in 1969, experienced a severe psychiatric deterioration in the weeks preceding the offense and was completely under the control of delusional forces at the time of the shooting.

The sole expert witness for the defense, Dr. Di Di Bailey, testified that she exam-ined appellant in February and May of 1977 and found him to be experiencing delusions and hallucinations on both occasions. She concluded that appellant was suffering from a mental disease at the time of the offense and that the offense was the "product" of his disease.[4]

On rebuttal, the government's only expert witness was Dr. James L. Evans, who testified that he examined appellant in April and May of 1977 and found that, although appellant may have suffered from a psychotic illness at some point in 1976 or 1977, he appeared to be recovering and was not suffering from an illness at the time of the examination. He concluded, however, that the offense was not the "product" of any illness appellant suffered in the past.[5]

After appellant was convicted and an appeal was noted to this court, appellate counsel filed a motion for a new trial pursuant to Super.Ct.Cr.R. 33, basing the motion on newly discovered evidence and ineffective assistance of trial counsel. In support of his claim of newly discovered evidence, appellant included: (1) evidence that, during part of the period between Dr. Bailey's first examination of appellant and Dr. Evans' examinations, appellant was hospitalized at D. C. General Hospital's Ugast Center and was administered daily 600 milligrams of thorazine, "a psychoactive drug which is

1. Appeal No. 79–654 is an appeal from the denial of the motion for a new trial. Appeal No. 13444 is a direct appeal from appellant's convictions. The appeals present essentially the same issues and were consolidated by this court sua sponte.

2. Appellant has also urged this court to adopt the rule of *United States v. Bennett,* 148 U.S. App.D.C. 364, 460 F.2d 872 (1972), and hold that the nondisclosure to the jury of the fact that appellant was administered psychoactive agents before a psychiatric examination deprived him of a full and fair hearing on the issue of insanity and mandates reversal. In *Bennett,* however, unlike the present case, the testimony by the government experts who withheld the drug therapy information "was the only evidence offered by the government in opposition to Bennett's insanity defense." *Id.* at 368, 460 F.2d at 876. For that reason and because we dispose of this case on ineffective assistance grounds, we decline to adopt the *per se Bennett* approach and instead factor into our Sixth Amendment analysis defense counsel's failure to discover or reveal to the jury the evidence that appellant received thorazine.

3. The shooting took place at the Department of Transportation, 200 Second Street, S. W., Washington, D. C.

4. All medical testimony in appellant's defense case was couched in terms of "productivity," a term associated with the *Durham* test of insanity which was no longer in use in this jurisdiction at the time of trial. *See generally Bethea v. United States,* D.C.App., 365 A.2d 64 (1976), *cert. denied,* 433 U.S. 911, 97 S.Ct. 2979, 53 L.Ed.2d 1095 (1977); *Durham v. United States,* 94 U.S.App.D.C. 228, 214 F.2d 862 (1954).

5. The government also presented seven lay witnesses who testified that they had never seen bizarre behavior on the part of appellant before the shooting.

used for the purpose of ameliorating the symptomatology of certain forms of psychosis, including schizophrenia;"[6] (2) the opinion of Dr. Steven Steury, the psychiatrist who examined appellant upon his admission to the Center and supervised his medication, that appellant was a paranoid schizophrenic; and (3) Dr. Evans' affidavit stating that he had never been comfortable with his diagnosis of appellant and that, if questioned under the proper legal insanity standard,[7] he would testify that appellant was possibly not criminally responsible for the offense.[8]

In support of his ineffective assistance of counsel claim, appellant argued that his trial counsel's gross incompetence blotted out the essence of his insanity defense. He contended there, as on appeal, that counsel failed to: (1) prepare appellant's only expert witness adequately; (2) obtain information available to him from appellant's medical files at the Ugast Center (specifically the evidence of medication and the reports of two doctors whose diagnoses cast doubts on Dr. Evans' testimony and bolstered the defense theory); and (3) present the insanity defense properly (e. g., by using the *Durham* test of insanity when that test had been explicitly rejected and replaced more than one year before appellant's trial by this court's opinion of *Bethea v. United States*, D.C.App., 365 A.2d 64 (1976), *cert. denied*, 433 U.S. 911, 97 S.Ct. 2979, 53 L.Ed.2d 1095 (1977)).

The trial judge denied the motion on both grounds. He reasoned that, absent a showing that due diligence would not have re-sulted in the discovery of this evidence before trial, the motion could not be granted on the basis of newly discovered evidence.[9] He also ruled that, although counsel could have prepared the case more thoroughly, his performance was not so grossly incompetent as to blot out the essence of appellant's defense. First, he credited trial counsel's testimony that he had spoken with Dr. Bailey for twenty minutes before trial and ten minutes during trial, characterizing these as "conversations . . . of substantial length." Second, he found that, even without the newly discovered medical evidence, counsel was able to discredit Dr. Evans' testimony.[10] Finally, the judge found that counsel's use of the *Durham* standard was a tactical decision, made because Dr. Bailey had prepared her report in terms of "productivity," and counsel thought he could elicit more positive responses from her by using the *Durham* standard than he could by using the proper *Bethea* standard.

Appellant bears a concededly heavy burden in demonstrating that his trial counsel's ineptness deprived him of his Sixth Amendment right to the effective assistance of counsel. In order to prevail, he must show " 'that there has been gross incompetence of counsel and that this has in effect blotted out the essence of a substantial defense.' " *Angarano v. United States*, D.C.App., 312 A.2d 295, 298 n.5 (1973) (quoting *Bruce v. United States*, 126 U.S.App. D.C. 336, 339–40, 379 F.2d 113, 116–17 (1967)). We will not penalize mere errors of judgment, *Woody v. United States*, D.C. App., 369 A.2d 592 (1977), nor measure coun-

6. Affidavit of Dr. Steven Steury, psychiatrist, D. C. General Hospital's Ugast Center.

7. *See* note 4 *supra.*

8. Appellate counsel also presented appellant's medical records from Capitol Hill Hospital and the Army, neither of which was presented at trial and both of which showed a history of medical problems consistent with the defense theory.

9. In order to obtain a new trial on the basis of newly discovered evidence, the movant must show that (1) the evidence was discovered after the trial; (2) it is not merely cumulative or impeaching; (3) it is material to the issues in the case; (4) it is of such a nature that it would probably produce an acquittal at a new trial; and (5) diligent efforts were made to procure the evidence. *Heard v. United States*, D.C. App., 245 A.2d 125 (1968). The trial judge found that appellant had satisfied all but the final prerequisite.

10. The judge credited counsel's testimony that his cross–examination objective was to show that Dr. Evans had not done his "homework" in preparing appellant's evaluation and that he had come too late into the case to draw a definitive conclusion.

sel's tactical decisions by their success at trial. *Williams v. United States*, D.C.App., 374 A.2d 885, 890 (1977). But if after applying a "totality of the circumstances" test, *Oesby v. United States*, D.C.App., 398 A.2d 1, 4 (1979), it clearly appears that counsel's performance resulted in prejudice to the appellant, reversal for a new trial is compelled. *Id.* at 8.

Our recent decision of *Johnson v. United States*, D.C.App., 413 A.2d 499 (1980), is helpful in evaluating appellant's claims. There, the appellant was charged with taking indecent liberties with and enticing a minor child. Ten days before trial, his trial counsel was told about a medical report that directly contradicted the complainant's story, but made no efforts to secure the report, to interview the doctor, or to ensure the doctor's presence at trial. In discussing the issue of gross incompetence, the first prong of the *Angarano* standard, we stated:

Trial counsel was grossly incompetent in his trial preparation by failing to investigate the favorable medical report, to seek to obtain a copy of the report, and to secure and present the testimony of [the doctor] himself. "Counsel has a duty to conduct an independent investigation of the facts and circumstances of a given case." *Oesby v. United States, supra* at 8 n.14; *see Von Moltke v. Gillies*, 332 U.S. 708, 721 [, 68 S.Ct. 316, 322, 92 L.Ed. 309] (1948); *Hampton v. United States*, D.C. App., 340 A.2d 813, 817 (1975). Pretrial preparation is "susceptible to reasonably objective determinations," *Monroe v. United States*, D.C.App., 389 A.2d 811, 819 (1978), and the failure to investigate is one such objective violation of an attorney's duty to his client. *See Monroe v. United States, supra* at 821 (" 'Counsel must conduct appropriate investigations, both factual and legal, to determine if matters of defense can be developed ....' " (quoting *Coles v. Peyton*, 389 F.2d 224, 226 (4th Cir.), *cert. denied*, 393 U.S. 849 [, 89 S.Ct. 80, 21 L.Ed.2d 120]

(1968)). Proper investigation is particularly crucial where the central issue is a question of credibility between the key government witness and the defendant. *See Farrell v. United States*, D.C.App., 391 A.2d 755, 761 & n.2 (1978). [*Johnson v. United States, supra* at 503 (footnote omitted).]

■ We find that the preparation and presentation of appellant's insanity defense was similarly grossly incompetent. Appellant's counsel made the decision to present the defense on August 17, 1976, after his first conversation with appellant. Although appellant was hospitalized for treatment and evaluation from January 21, 1977 to February 24, 1977, counsel never attempted to secure the medical records or to investigate what happened to his client at the Center. Had he merely examined the records, he would have found that, from appellant's first day at the Center, and before Dr. Evans' examinations appellant was given a heavy daily dosage of the drug thorazine, which inhibits delusional ideas and hallucinations, and under the influence of which "[t]he sullen, sarcastic and antagonistic patient is less irritable and frequently becomes quiet, cooperative, and accessible." *See United States v. Bennett, supra* at 368, 460 F.2d at 876 (citing Kolb, Noyes' Modern Clinical Psychiatry 393 (7th ed. 1968)).[11] This information, which the trial judge found to be clearly material, possibly outcome determinative, and more than merely impeaching or cumulative evidence, was easily available to counsel and should have been presented to the jury to assist it in evaluating Dr. Evans' testimony. As the trial judge stated, "[t]he evidence of drug treatment was in defendant's medical file and could have been discovered, it would seem, by trial counsel as readily as it was discovered by appellate counsel. * * * Quite simply, the information was all there; all trial counsel had to do, it appears, was ask."[12]

11. At the hearing on the motion for a new trial, appellant's trial counsel testified that, before trial, he was aware of the significance of thora-zine and the effect it could have on a patient's personality.

12. Mem.Op. at 12.

A review of appellant's medical files also would have revealed the reports of two other doctors, both of whom supported the defense expert's diagnosis. Dr. Steury diagnosed appellant as paranoid schizophrenic both at the beginning of his hospitalization (before drug treatment) and at the end. Dr. Herbert Hagenau, who evaluated appellant on December 2, 1976 and on May 6, 1977, diagnosed him as paranoid schizophrenic with psychopathic elements.

Trial counsel not only failed to obtain the medical files, he also failed to prepare Dr. Bailey adequately. Although counsel knew approximately eighteen months before trial that he was going to present an insanity defense, he did not speak with the sole defense psychiatrist until "a day or two before trial."[13] He also admitted that this conversation was couched in conclusory terms regarding "productivity," and that he never inquired about the factual basis for the psychiatrist's opinion. Other than this twenty–minute conversation, counsel had only one ten–minute conference with Dr. Bailey during a recess at trial. In light of the complexities of the insanity defense, it is difficult to agree with the trial judge that these conversations were of "substantial length."

Finally, trial counsel was grossly incompetent in predicating his entire defense strategy upon the *Durham* standard of "productivity,"[14] a standard this court found to have "outlived its usefulness" over sixteen months before appellant's trial. *Bethea v. United States, supra* at 76. Appellant argues that counsel was totally unfamiliar with the *Bethea* standard[15] at the time of trial; appellee argues that counsel was aware of the proper standard, but chose to use the *Durham* standard to highlight his expert's testimony. We need not accept either argument, however, for we conclude that, whether counsel was ignorant of the *Bethea* test, or knew of the standard and intentionally chose to ignore it, the use of a judicially rejected legal standard by a member of the legal profession constitutes gross incompetence.

Under the *Angarano* test, a finding of gross incompetence is not enough to compel reversal of a conviction; we must also find that the incompetence in effect blotted out a substantial defense. *See Johnson v. United States, supra* at 504. In *Johnson*, we held that, where the credibility of a key government witness is a crucial issue in the case and counsel, through incompetence, fails to present highly credible impeachment material, a substantial defense may be blotted out. *Id.* For the reasons that follow, we find that trial counsel's incompetence in effect blotted out appellant's defense.

The critical issue in appellant's defense case was credibility; the jury had to choose whether to believe Dr. Bailey's diagnosis of a mental disease and "productivity" or Dr. Evans' diagnosis that, although appellant *might* have had a mental illness, there was no "productivity." The information available in the medical records, lost through incompetence, was important to at least three aspects of Dr. Evans' testimony: (1) his finding that appellant may have been recovering from a mental illness; (2) his firm

---

13. Transcript of the hearing on the motion for a new trial at 19.

14. The *Durham* standard was:
   [A]n accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect. [*Durham v. United States*, 94 U.S.App.D.C. 228, 240–41, 214 F.2d 862, 874–75 (1954), *quoted in Bethea v. United States, supra* at 73.]
   In rejecting this standard in favor of a modified American Law Institute standard, *see* note 15 *infra*, we noted that the *Durham* test "expressed the relationship [between the illegal conduct and a cognizable mental impairment] in a terse formula which has proved to be both

deficient in its comprehensibility and adverse in its impact upon the allocation of adjudicatory authority." *Bethea v. United States, supra* at 77.

15. The *Bethea* standard reads, in pertinent part:
   A person is not responsible for criminal conduct if at the time of such conduct as a result of a mental disease or defect he lacked substantial capacity either to recognize the wrongfulness of his conduct or to conform his conduct to the requirements of law. [*Id.* at 79.]

conclusion of "no productivity;" and (3) his statement that he conferred with Dr. Steury (possibly leading the jury to believe that Dr. Steury concurred in his opinion) coupled with his testimony that visual hallucinations are inconsistent with schizophrenia. The evidence of appellant's drug therapy would have been highly illuminative of appellant's mental state at the time of Dr. Evans' examination and helpful in evaluating the relevance of his conclusion. This was a crucial piece of information for the jury to use in crediting or discrediting his entire testimony. As Dr. Evans stated in his post–trial affidavit:

As a psychiatrist, it is my opinion, based on substantial scientific data, that the administration of psychoactive drugs, such as thorazine (phenothiazine) in a therapeutic environment can, and in Mr. Tillery's case probably did, produce a substantial diminution in the symtomatology of his psychosis. Indeed, a positive responsiveness to such chemotherapy is an indication of the severity of the psychosis, and it is my recollection that Mr. Tillery did respond positively to thorazine. While such medication would not impair my ability to diagnose Mr. Tillery's condition as of the point in time of my examination of him, it again raises a question of the relevance of this examination as an indicator of his mental state at the time of the offense. As a consequence of this and other factors, I have never been comfortable with my conclusion as to a lack of productivity.

This critical information was lost, however, merely because counsel failed to take the elementary step of examining his client's medical records.

Similarly, when Dr. Evans testified that his conversations with Dr. Steury formed part of the basis for his ultimate opinion, and testified that delusions and hallucinations were inconsistent with schizophrenia, counsel was unable to impeach this testimony with Dr. Steury's contradictory opinion.[16] We agree with the trial judge that the

fact that Dr. Steury, after a five week period of observation, concluded that defendant was suffering from paranoid schizophrenia and that his diagnosis was consistent with that of Dr. Bailey is the type of "information that calls into question the validity of [Dr. Evans'] entire testimony, and might–if disclosed–have led the jury to disregard [his] stated conclusions." [Mem.Op. at 12 (quoting United States v. Bennett, supra at 368, 460 F.2d at 876).] [17]

At trial the evidence of insanity was generally evenly balanced.[18] We are unable to conclude, particularly in light of the judge's instruction to the jury that "[i]f you believe the evidence of insanity is evenly balanced, then your finding . . . must be against the defendant," [19] appellant's defense very well may have been prejudiced by counsel's failure to present the readily available medical evidence.

Finally, we deal with counsel's use of the wrong insanity standard. The government argues that there is actually very little difference between the Durham and the Bethea standards and, consequently, appellant was not prejudiced by the use of the Dur-

16. Appellant's medical records from the Ugast Center reveal that Dr. Steury was aware of appellant's delusional ideas when he wrote that "the violent behavior with which Mr. Tillery stood accused when he was at the Ugast Center is thoroughly consistent with my discharge diagnosis [of paranoid schizophrenia]." Affidavit of Dr. Steven Steury.

17. Dr. Hagenau's opinion, which was consistent with Dr. Bailey's diagnosis of mental illness and possibly even more relevant, since his first diagnosis was more contemporaneous to the offense, also would have been valuable direct or impeachment evidence. Neither Dr. Steu-ry's nor Dr. Hagenau's report contained a conclusion concerning appellant's criminal responsibility. However, this would not have precluded appellant's counsel from interviewing them and investigating the possibility of their testifying or converting their opinions from a diagnosis to an ultimate medical opinion on the issue of responsibility.

18. Indeed, the trial judge characterized the difference between the opinions of Dr. Evans and Dr. Bailey as "one of degree." Mem.Op. at 11.

19. Trial transcript at 448.

*ham* test. We disagree. Although there may be little distinction between the substantive contents of the two standards, *see Bethea v. United States, supra* at 75, we think the differences in terminology are significant.[20] The *Bethea* standard avoids the concept of "product," a concept that is meaningless to experts and misleading to lay jurors. *Id.* at 77. In addition, it "counters the potentially overriding influence of the experts by shifting the focus from the direct question of whether the condition 'produced' the act to the issue of whether the condition substantially impaired the individual's capacity to obey the law." *Id.* at 76 (footnote omitted).

Moreover, even assuming the government were correct that there are minimal differences between the two standards, those differences in the language of the tests are magnified under the circumstances of appellant's trial. All of the expert opinions were presented to the jurors in terms of whether the offense was the "product" of a mental illness. Yet, for the first time, in the final instructions, the jurors were told that they were to decide the insanity issue under a wholly different standard.[21] Surely this shift in nomenclature must have injected confusion into their deliberations. *Cf. Parker v. Randolph,* 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979) (crucial assumption underlying system of trial by jury is that jurors follow instructions given to them by trial judge).

We cannot accept trial counsel's use of the wrong standard as a tactical choice that we should decline to review. This error

was so fundamental and crucial to the defense that it cannot fall under the rubric of tactical choice.

Applying the totality of the circumstances test, we conclude that appellant's trial counsel's gross incompetence in the preparation, investigation, and presentation of appellant's insanity defense effectively blotted out a substantial defense, thereby depriving him of his Sixth Amendment right to the effective assistance of counsel.[22] Accordingly, we reverse his convictions and remand the case for a new trial.

*Reversed and remanded.*

---

**20.** Dr. Evans stated in his post–trial affidavit:

It is my opinion that the [*Bethea* standard] differs materially in orientation and concept from the [*Durham* standard]. The productivity standard which I used requires a more direct or linear relationship between the mental disease or defect and the alleged conduct than the [*Bethea* standard]. It is my opinion that these two standards are potentially contradictory insofar as an opinion made under one standard may not necessarily be consistent with an opinion made under the other. The [*Bethea* standard] appears more flexible and provides more of a role for testimony regarding clinical observation and other more

objective data than the more conclusory productivity standard . . . .

**21.** In the insanity instruction, the *Bethea* standard was repeated five times; and word "product" was mentioned once at the end.

**22.** We note that the Supreme Court has recently characterized this area of constitutional law as "inevitably nebulous." *Ohio v. Roberts,* —— U.S. ——, —— n. 12, 100 S.Ct. 2531, 2543 n. 12, 65 L.Ed.2d 597 (1980). Even though it is an area that is not susceptible of precise definition, we find that counsel's conduct in this case unquestionably fails to surmount that "inevitably nebulous threshold of 'effectiveness.' " *Id.*