John L. **WILLIAMS**, a/k/a Johnny L. Williams, Appellant,

v.

**UNITED STATES, Appellee.**

Nos. 12690, 12691 and 13996.

District of Columbia Court of Appeals.

Submitted Oct. 30, 1979.

Decided Jan. 12, 1982.

Donna L. Crossland, appointed by this court, for appellant.

Carl S. Rauh, U. S. Atty. at the time the briefs were filed, Washington, D. C., and John A. Terry, Peter E. George, Timothy J. Reardon, III, and Martha P. Rogers, Asst. U. S. Attys., Washington, D. C., were on the brief for appellee.

Before MACK and PRYOR, Associate Judges, and GALLAGHER,* Associate Judge, Retired.

GALLAGHER, Associate Judge, Retired:

After a jury trial before then Chief Judge Harold H. Greene, appellant was convicted of rape while armed, burglary, assault with a dangerous weapon, mayhem or malicious disfigurement, and a violation of the Bail Reform Act. He received concurrent sentences on each of those convictions, except for the violation of the Bail Reform Act, for which he received a 90-day consecutive sentence. After sentencing, appellant filed a Motion to Set Aside Illegally Imposed Sentence under D.C.Code 1973, § 23–110 on the ground the sentences imposed resulted from defendant's conviction after a trial where he had been denied effective assistance of counsel. The trial judge ordered a hearing on the motion and referred it to another judge to conduct the hearing and dispose of the motion. After an evidentiary hearing, the judge entered a 10-page memorandum opinion in which he concluded the motion should be denied.

There was an exhaustive hearing on the motion in this case, at the end of which the trial court entered voluminous findings which reveal a painstaking and thorough analysis of the evidence and the issues. We see no reason to disturb those findings and certainly find no basis to conclude they are plainly wrong, which is our controlling test on review in this case. D.C.Code 1973, § 17–305(a). *See Timus v. United States*, D.C.App., 406 A.2d 1269 (1979); *McFadden v. United States*, D.C.App., 395 A.2d 14 (1978).

We are accompanying this opinion by the trial court's Memorandum Opinion, which we incorporate into our decision.[1]

*Affirmed.*

## APPENDIX

### SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

Criminal No. 102024–76

UNITED STATES OF AMERICA

v.

JOHNNY L. WILLIAMS

### MEMORANDUM OPINION

This matter is before the court for consideration of defendant's motion to vacate a sentence allegedly imposed in violation of

---

* Judge Gallagher was an Associate Judge of the court at the time the case was submitted. His status changed to Associate Judge, Retired, on February 27, 1981.

1. The dissent sets out at length the petitioner's side of the issue post-trial. We might comment, in passing, that defense counsel in this case made an extensive pretrial investigation and there were compiled some 200 pages of investigative reports. There was no lack of pretrial diligence. The dispute centers on tactical decisions during trial. The trial court's Memorandum Opinion judiciously deals with these tactical decisions.

It would serve no worthwhile purpose to retrace the ground crossed by the trial court, whose opinion we have included as an Appendix. After a lengthy hearing, observation of the witnesses and consideration of the relevant documents, the trial court made thoughtful and extensive findings of fact and concluded that ineffective assistance of counsel was not established. The dissenting judge will have none of it. We think a careful and deliberate job was done by the trial court and see no reason to reverse.

defendant's constitutional right to effective assistance of counsel.[1]

## I.

According to evidence presented by the government during the trial on the merits, the complaining witness, while at home alone, was brutally assaulted and raped in the morning hours of November 5, 1976. After having been beaten by a stick, resulting in a fracture to her right humerus and slashed with a knife, the complainant was pummelled about her left eye causing a detachment of the retina and ultimate blindness as she had already lost sight in her right eye approximately four years before this incident. Thereafter, by her testimony, she was forcibly raped. After a period of unconsciousness, her husband returned home from work to find his wife gagged and bound to a chair. Metropolitan Police were notified and an ambulance was summoned. While waiting for the ambulance to arrive, complainant identified John L. Williams, a man she had known for more than ten years, as the assailant-rapist. Defendant presented essentially an alibi defense. He alleged that he was at home with his wife on the morning of the crime, ailing from a painful back injury. Defendant presented testimony and demonstrative evidence to support his contention of disability, including a container of analgesic tablets.

After five days of jury trial before the Honorable Harold H. Greene,[2] defendant was convicted on charges of rape, mayhem, assault with a deadly weapon, burglary and a Bail Reform Act violation. Defendant received concurrent terms of five to twenty years for rape, five to twenty years for mayhem, three to ten years for burglary, three to ten years for assault with a deadly weapon and a consecutive term of ninety days for the Bail Reform Act violation.

Defendant now alleges,[3] through newly appointed counsel, that he was denied his constitutional right to effective assistance of counsel. Defendant levies numerous allegations against counsel's trial conduct, including 1) a failure to "vigorously" develop, at trial, the extent of defendant's back injury which allegedly would have prevented defendant from exerting the physical force necessary to commit the assault, 2) a failure to introduce the medical records of the complainant's admission to D. C. General Hospital that would have shown that the complainant was a chronic alcoholic, 3) a failure to produce testimony from Dr. Morris, a treating physician, that the complainant was intoxicated at the time she arrived at the hospital, 4) a failure to call an investigator to impeach complainant's testimony that the assault occurred in her apartment, 5) a failure to call an available witness to impeach complainant's testimony that she had not been drinking on the morning of the incident, 6) a failure to call two witnesses to contradict the government's evidence regarding the manner in which complainant was bound and gagged, 7) a failure to call a witness that would have impeached the testimony of complainant's husband that the door was ajar when he arrived, 8) a failure to call a witness to impeach complainant's testimony about the time of the incident, 9) a failure to cross-examine complainant regarding her failure to adequately describe the assailant, 10) a failure to cross-examine a neighbor-witness about alleged beatings inflicted upon complainant by her husband and the defendant's reputation in the community for peacefulness, 11) a failure to explore the possibility of a robbery in the apartment, 12) a failure to make a motion for judgment of acquittal on the rape charge at the end of the government's case or at the close of all the evidence, 13) a failure to request Jencks material and finally, 14) a failure to attempt to sever the Bail Reform Act charge from the other charges.

1. D.C.Code 23 § 110. A hearing was granted by the Honorable Harold H. Greene on June 13, 1978. See *Johnson v. United States*, D.C.App. Nos. 11468 and 12492 (March 29, 1978).

2. Associate Judge, United States District Court for the District of Columbia, then sitting as Chief Judge, Superior Court.

3. Notice of Appeal was filed on October 3, 1977.

Defendant also makes an allegation in reference to pretrial conduct of counsel involving a failure to adequately prepare defendant and defendant's witnesses for trial testimony.

## II.

This court is not unmindful of the recent decisions of the D.C. Court of Appeals in *Monroe v. United States*, No. 12451 (July 18, 1978) and *Farrell v. United States*, D.C. App. No. 12051 (August 21, 1978), involving pretrial claims of ineffective assistance of counsel, however, since this motion arises post-trial, the applicable test is that announced in *Angarano v. United States*, D.C. App., 312 A.2d 295, 298, n. 5 (1973).[4] Defendant must show, by a preponderance of evidence,[5] that the performance of trial counsel was grossly incompetent and that this had in effect blotted out the essence of a substantial defense. The court, in *Monroe, supra*, at 12–13, identified three reasons for which courts have adopted the relatively strict standard for consideration of allegations against trial counsel asserted only after the government has obtained guilty verdicts. The second rationale discussed, that of avoidance of evaluation by hindsight, is particularly relevant to the disposition of this motion.

## III.

After taking testimony and considering documents and affidavits in support of the defendant's motion, the court concludes that the allegation that trial counsel failed to adequately prepare for trial is unfounded. The court is particularly sensitive to such allegations, having had the opportunity to review them in *United States v. Sweet*, Criminal No. 9994–75 (Memorandum Opinion on July 28, 1978) (new trial granted because of trial counsel's failure to prepare) and completely agrees with the American Bar Association statement that,

4. Chief Judge Newman, writing for the court in *Monroe*, did not specifically readopt the *Angarano* standard for post-trial claims leaving the issue open for future adjudication. This court,

"It is axiomatic among trial lawyers that cases are not won in the courtroom but by long hours of laborious investigation and careful preparation ... It is impossible to overemphasize the importance of appropriate investigation to the effective and fair administration of criminal justice." [ABA Standards Relating to the Defense Function § 41, Introductory Note at 224–25 (Approved Draft 1971)]

However, the testimony of defendant and his wife that it was difficult to contact trial counsel and that he failed to prepare defense testimony for the rigors of cross-examination is effectively rebutted by defendant's own testimony that he met with trial counsel at least three times for thirty-minute periods before trial and spoke with trial counsel's investigator on numerous occasions. In fact, after the investigator interviewed potential witnesses, she prepared over 200 pages of reports, all of which were transferred to trial counsel. The alibi defense raised in this case was not complicated factually, thus even limited attorney-client conferences would have been more than adequate to prepare the defense for trial.

Even though a large portion of the defendant's testimony related to the failure of trial counsel to communicate and prepare, newly appointed counsel so much as admits that the allegation is insubstantial. In her amended points and authorities in support of her motion, she concludes that,

"This is not a situation in which trial counsel failed to prepare at all. His files, which were provided to this counsel, contained every record, report and interview referred to, except the conversation with Dr. Hartsock.

The situation presented to this court is one in which trial counsel, for whatever reason, failed to use most of the evidence he had at his disposal."

of course, is bound by the outstanding precedent until overruled.

5. *See Bolton v. Harris*, 130 U.S.App.D.C. 1, 12, 395 F.2d 642 (1968).

The court, thus, concludes that trial counsel's preparation for this case was not merely adequate but commendable in light of the circumstances involved in this case.

What remains for the court to consider are the numerous allegations involving conduct during the trial. Newly appointed counsel admits in her amended points and authorities that all of these allegations involve tactical decisions that when considered separately are clearly not an adequate basis for relief. *Woody v. United States*, D.C.App., 369 A.2d 592, 594 (1977) (mere errors of judgment as disclosed by subsequent events or hindsight are not sufficient to establish ineffective assistance).

Defendant argues, however, that when all of these allegations are considered together, the combined effect is a sufficient basis to award defendant the relief he requests. The court concludes that the record in this case reflects that the alleged omissions do not rise to the level of blotting out a substantial defense.

The foremost allegation, for which the court received the majority of testimony, involves the alleged failure to present medical testimony to the effect that it would have been highly improbable for defendant to have been able to commit the assault due to a painful degenerative back condition. On the basis of what trial counsel had before him at the time of trial, however, his decision to refrain from calling medical experts for testimony was rational and well-founded in light of Dr. Fulcher's report, which stated that defendant's back condition was not so severe as to require surgery and that defendant was to return to work. Although it is true that Percodan, a narcotic, was prescribed by Dr. Cawood on October 26, 1976, defendant was not taking the Percodan at the time of the crime. Defendant was referred to Dr. Fulcher by Dr. Cawood for a neurological consultation on November 3, 1976. After his examination, Dr. Fulcher prescribed Equagesic, a mild non-narcotic sedative, to replace the Percodan. Thus, any allegation that defendant was incapacitated by the narcotic effect of Percodan is unfounded. The court has been presented with an affidavit from Dr. Fulcher which concludes that it appeared "unrealistic that this rather gentle man could have become a maniac capable of performing these acts described..." (Affidavit of Dr. Fulcher, p. 3). Notwithstanding the fact that a portion of the doctor's conclusion is based on neurological findings, it appears that Dr. Fulcher has drawn psychoanalytical conclusions as well. The court concludes, with all due respect, that Dr. Fulcher's strong feelings of sympathy for defendant, as documented in his affidavit and his letter to defendant, has somewhat lessened his objectivity. In any event, the original consultation report prepared by Dr. Fulcher for submission to his colleague and for use in the management and care of the defendant clearly defined the nature and extent of the physical condition of the patient. This condition was not such as to keep defendant from working and was a known transient type of condition. Furthermore, the fact that defendant had a painful back condition was put before the jury for their consideration by the testimony of the defendant and the admission of the prescription pain killers into evidence. Thus, even though the defense was not as "vigorously" presented as newly appointed counsel would have preferred, it can hardly be said that trial counsel's omission of medical testimony on this point rises to the level of blotting out a substantial defense. Newly appointed counsel has also alleged that trial counsel should have more vigorously developed the fact that there was no physical evidence of the rape in the medical records. This allegation is likewise insubstantial as the matter was dealt with in such a forceful fashion in trial counsel's closing argument that the prosecutor felt obligated to refer to the matter again in the final remarks of his rebuttal argument.

The court reaches the same conclusion on the third of these allegations involving the failure to call Dr. Morris or admit the hospital records in reference to the complainant's alcoholic intemperance. What trial counsel had before him to support the allegation that complainant was intoxicated when she arrived at the hospital was an unsupported

claim by Dr. Morris to counsel's investigator, in which Dr. Morris admits that he was having difficulty remembering details of the incident because he did not have his records before him at the time of the interview. The allegation of intoxication was refuted not only by the absence of any such notation in the hospital records, but by the numerous references to complainant's coherent and cooperative mental state at the time she arrived in the emergency room. In fact, the only notation of alcoholism was contained in the medical history taken from the complainant, not from any physical findings by any of the hospital staff or treating physicians. The fact that complainant was an admitted chronic alcoholic does not require a conclusion that she was intoxicated at any particular point in time. Not to be overlooked also, was trial counsel's reasoning with respect to the hospital records which included his concern for their prejudicial effect. These records portrayed graphically a very severely battered and beaten woman. In light of the evidence before trial counsel at the time of trial, his decision to refrain from calling Dr. Morris or to admit the hospital records was well reasoned and logical.

The other allegations of failures to impeach government witnesses by cross-examination or the presentation of defense testimony, even if accepted as wholly true, do not rise to the required test as these involved peripheral matters that may have had even an adverse effect on defendant's case, especially with reference to the available testimony of Mr. Moore, who was prepared to testify on cross-examination that defendant was interested in obtaining a gun and had been drinking on the morning of the crime.

The remaining allegations involve the failure to make a motion for judgment of acquittal on the rape charge and a failure to attempt to sever the Bail Reform Act charge from the other charges. As to the former allegation, it is clear that had such a motion been made, it would have properly been denied.[6] As to the latter allegation,

trial counsel adequately explained that since he felt that defendant had a high likelihood of being acquitted on the Bail Reform Act charge, that to have it tried simultaneously with the other charges would have had a beneficial effect on the outcome of all the charges involved.

These allegations, therefore, whether considered separately or together, do not rise to ineffective assistance as trial counsel's decisions were rational and in many instances even wise. At the very least, the matters and their alternatives were considered and a judgment-strategical and tactical made.

### IV.

The court has drawn a distinct line between consideration of allegations of failure to prepare and communicate and allegations of tactical errors made during the trial. The court has concluded that trial counsel was well prepared for trial and newly appointed counsel has essentially admitted this fact. Except in very strained and peculiar instances, this is where the court's inquiry into ineffective assistance allegations should properly terminate. The retrospective analysis by newly appointed counsel into the manner in which trial counsel conducted the defense presentation and cross-examined government witnesses invades an area properly reserved for the trial counsel as only he can be aware of the multi-faceted intangibles in the courtroom atmosphere which are so important to the outcome of the litigation. Reasoned decisions and tactical determinations reflecting strategic considerations are and should remain the province of the trial lawyer. The Sixth Amendment, by whatever test applied, does not require the perfection of rear-view vision.

The ever increasing popularity of seeking post-trial relief following conviction by assertion of a claim of ineffective assistance of counsel is a procedural maneuver which can greatly overburden the trial court, if abused. Though, undoubtedly, counsel ap-

---

6. *See Arnold v. United States*, D.C.App., 358 A.2d 335, 339–44 (1976).

pointed to represent the defendant in appellate proceedings are placed under considerable pressure by a defendant convicted in the trial court, that pressure is really no greater than that experienced by the trial attorney who knew he was representing a defendant who would embrace him upon acquittal but had an alternative in mind should he be convicted. Obviously that alternative included a target—his trial attorney. And this, of course, would be separate and apart from errors raised on the record in the appellate court.

As indicated, supra herein, this court is by no means reluctant to award a new trial on the basis of ineffective assistance of counsel, when and if the record warrants such relief under the law. The trial court has an understandable stake in this general subject. Appellate court direction is that a hearing is to be held and testimony received and thereafter Findings of Fact and Conclusions of Law prepared. Obviously, such a post-trial mini-hearing has its effect upon the calendar of each trial judge. Where warranted, it is of course justified. On the other hand, the subject is not one to be exploited with frivolous motions. The law of this jurisdiction is reasonably clear as to the guidelines for establishing ineffective assistance of counsel. The case which does not fall within those guidelines should not be the subject of a motion simply for the sake of a motion being filed.

WHEREFORE, it is this 11th day of September, 1978

ORDERED, that the motion herein, to vacate the sentence imposed in violation of defendant's constitutional right to effective assistance of counsel, be and hereby is denied.

/s/ William E. Stewart, Jr.

WILLIAM E. STEWART, Jr.

Judge

cc: Donna L. Crossland, Esq.

Paul Knight, Esq.

Assistant United States Attorney

Charles O'Banion, Esq.

MACK, Associate Judge, dissenting:

As I read the transcript of trial proceedings, and that of the post-conviction hearing which the trial judge ordered, I am troubled. With all due deference to the observations of the able hearing judge who rejected the claim of ineffective assistance of counsel, I am obliged to point out that his memorandum opinion, which the majority today adopts without significant comment, was issued prior to recent decisions of this court which have identified the kind of gross incompetence by defense counsel which may blot out a substantial defense under *Angarano v. United States*, D.C.App., 312 A.2d 295 (1973), *pet. for rehearing denied*, D.C.App., 329 A.2d 453 (1974) (en banc). *See Tillery v. United States*, D.C. App., 419 A.2d 970 (1980); *Johnson v. United States*, D.C.App., 413 A.2d 499 (1980); *Oesby v. United States*, D.C.App., 398 A.2d 1 (1979). I am unable to distinguish this case from that of *Johnson, supra*, where we held that the failure to present highly credible evidence bearing on the credibility of a key government witness rose to the standard of prejudice enunciated in *Angarano*. In *Tillery, supra*, we echoed the importance of defense counsel not only preparing but presenting highly credible impeachment material where the critical issue was that of credibility.

I.

I do not think it can be seriously disputed that, in the instant case, credibility was a crucial issue. The unfortunate complainant was a key witness; it was only on her word that appellant was identified as the man who struck her repeatedly in the left eye, kicked her, beat her with a stick, broke her arm, tied and gagged her, cut her, ripped off her clothes and raped her. Defense counsel, prior to and during trial, possessed information that would have raised questions as to the competency of this witness to have perceived, at the time of the crime, not only precisely what had been done to her but who had done it. He did not use this evidence for impeachment purposes.

Thus, at trial the complainant testified that she did not drink any alcoholic beverages on November 5, 1976, the day of the assault, that she was not an alcoholic and did not have a drinking problem. On cross-examination, defense counsel sought to elicit testimony that complainant was a chronic alcoholic and had been drinking on the day of the assault. Receiving a denial from the witness, counsel pursued the matter no further. Yet counsel was possessed of the complainant's hospital records which revealed that from November 8–15, she lapsed into delirium tremens due to alcoholic intake sometime before coming into the hospital and that during that period, she experienced visual and auditory hallucinations. At various times she believed that there were dogs and puppies in her bed, and cats and dogs in her room. The medical records also disclosed that prior to admission, she had been taking medication to control a seizure disorder that she experienced since childhood. Furthermore, counsel was aware that one Dr. Morris, the physician who admitted complainant into the hospital, was of the opinion that she was intoxicated upon admission. Although counsel subpoenaed Dr. Morris, he did not call him to testify and he failed to employ any of this evidence to impeach complainant. Indeed, when the government sought to admit into evidence complainant's hospital records, counsel objected and stated that he did not comprehend their relevancy. The objection was sustained.

During the post-trial hearing, counsel explained that his decision not to pursue a line of cross-examination to develop complainant's drinking problem was based largely on an interview he had with her five months after the rape in which she appeared lucid and competent. "Moreover" as he testified, "the trial judge did not raise any questions as to [complainant's] competence." Counsel later added that he did not want to evoke sympathy for complainant by questioning her about her drinking problem. He did not want the hospital records introduced for the same reason and because they were not relevant to appellant's alibi defense. With regard to the testimony of Dr. Morris, coun-

sel decided not to call him because he "might" have testified that complainant reported to him that she had been raped, thus providing corroborative evidence.

I cannot view counsel's explanations as supporting the existence of a rational "tactical" decision. As I have noted, complainant was the only witness to place appellant within her apartment on the morning of the assault. Her testimony was, at times, confused and contradictory; her credibility was crucial; impeachment was essential to the defense. The medical evidence and testimony available to counsel and of which he was aware was highly credible and would have substantially bolstered appellant's defense. Counsel's decision not to present this evidence based on his interview of complainant and his desire to avoid the evocation of sympathy for her had no basis in reason: complainant's display of lucidity five months subsequent to the assault had no relevancy to the issue of her mental state on the date of her assault; that mental state was relevant to appellant's defense of alibi. The detriment of Dr. Morris' possibly adding to the fact that complainant reported rape pales in comparison to the benefit of his testimony concerning complainant's inebriated condition upon admission; the likelihood that introduction of that portion of complainant's medical record describing her injuries would have evoked sympathy for her was minimal compared to the previous introduction by the government of the more inflammatory evidence of photographs depicting her battered condition. In my view, counsel was grossly incompetent for failing to employ the impeachment evidence available to him concerning complainant's inebriated condition.

In like vein, I think that counsel was incompetent in failing to use favorable medical evidence which indicated that complainant's genital area was in a normal condition upon admission. Counsel did not subpoena or interview the gynecologist who examined the complainant, nor did he present any evidence regarding the examination. Instead, he chose to argue a nega-

tive inference concerning the government's lack of medical evidence of rape during closing arguments to the jury. When questioned at the post-trial hearing about his strategy at trial, counsel testified as follows:

Q. [Post Trial Counsel for appellant]: Why didn't you consider it relevant to call the gynecologist who examined her?

A. [Trial Counsel for appellant]: Well, it was obvious that no semen was found in the vagina—

Q. How was it obvious?

A. From the pretrial investigation.

Q. Well, what about the jury's information; how were they going to know that?

A. I pointed that out in closing argument that the Government had not produced any evidence of semen in the vagina.

Q. My question is: Did you not consider it a relevant point to bring up on defense?

A. Well, the point was brought up on defense, in the defense of Mr. Williams.

Q. But only in closing argument.

In this regard the instant case is factually similar to *Johnson v. United States, supra.* In *Johnson,* the defendant was charged with taking indecent liberties with and enticing a minor child. Ten days before trial, his counsel became aware of a medical report that concluded that there was no evidence of trauma in the complainant's vagina or genital area, thereby directly contradicting the complainant's account of the incident. The examining gynecologist was not subpoenaed or called to trial, although counsel attempted to present the medical report's negative findings indirectly in his closing argument by arguing that the government's failure to produce the results of the medical examination allowed an inference that the evidence would have been favorable to the defendant. In reversing the conviction and granting a new trial, we held that trial counsel was grossly incompetent in his trial preparation by failing to investigate the favorable medical report, obtain a copy of the report, and secure and present the testimony of the gynecologist. We concluded:

From the facts developed at the post-trial hearing it is undisputed that trial counsel was informed at least ten days prior to trial that Dr. Gaither's medical report would be favorable to the defense, yet trial counsel made no attempt to secure either a copy of the medical report nor to interview Dr. Gaither as a potential defense witness. This failure became salient when the government rested without calling Dr. Gaither to testify and trial counsel realized the favorable medical testimony would be lost. At that late juncture, the perfunctory issuance of a forthwith subpoena directed only to the doctor's place of previous employment proved unsurprisingly fruitless. Trial counsel was left with the sole option of arguing the negative inference from the failure of the government to present medical testimony. The fact that counsel was forced to exploit a negative inference is indicative of his inadequate preparation. [413 A.2d at 503.]

In my view *Johnson* is controlling here both as to the finding of incompetence and its significance to the defense. As we said in that case:

A 'substantial defense', however, is not limited to an affirmative defense or the presentation of an alibi defense. A defense may be predicated upon disproving an element of the crime charged, . . . or simply discrediting the testimony of the prosecution witness. . . . The loss of highly credible impeachment material, which may have been sufficient to cast a reasonable doubt on the government's evidence, blots out a substantial defense. [413 A.2d at 504–05 (citations omitted).]

II.

While I think, therefore, that *Johnson* would mandate reversal in this case, there is more. For additional reasons I cannot embrace the trial court's findings that defense counsel's omissions taken separately or together, did not rise to the level of ineffective assistance of counsel. Indeed as a matter of law, I would find the trial

**264**

court's assessment erroneous in that, after finding that counsel was well prepared for trial,[1] the court added "Except in very strained and peculiar instances, this is where the court's inquiry into ineffective assistance allegations should properly terminate." This is not the law—at least not at this point in time. *See Oesby v. United States, supra.*

In *Tillery, supra,* we applied the "totality of circumstances" test announced in *Oesby* in assessing the performance of counsel. We found the preparation and presentation of an insanity defense to be grossly incompetent. We noted that when it clearly appeared that counsel's performance resulted in prejudice to appellant, reversal for a new trial was compelled.

In my view the rationale of these cases compels a finding that the investigation, preparation and presentation of appellant's additional defense of physical impossibility was grossly incompetent. During the post-trial hearing, trial counsel testified that he did not pursue the defense of physical impossibility because "rather than get into a complex medical defense I concentrated primarily on the alibi defense." Counsel made this decision without fully comprehending the nature of appellant's ailment[2] or seeking medical advice either from the doctor who examined appellant or from outside medical experts. The evidence as developed in the post-trial hearing revealed that Dr. James C. Cawood examined appellant on October 26, 1976. Appellant complained of severe lower back pain and Dr. Cawood diagnosed it as "like a ruptured disc." Percodan, a very strong narcotic, was prescribed, x-rays were ordered and appellant

was advised to seek the advice of a neurologist, Dr. O. Hugh Fulcher, and to refrain from work for three months. Dr. Cawood was interviewed by defense counsel's investigator to whom he made a full disclosure of appellant's condition.

Dr. Fulcher examined appellant on November 3, 1976, two days prior to the assault on complainant, and deduced that he was suffering from a sciatica resulting from a pinching of the nerve root in the lower lumbar region. Dr. Fulcher postulated that this "pinching" had resulted from a "degenerated intervertebral disc between the fifth lumbar vertebra and the first sacral segment." Equagesic, a sedative, and a sacroiliac belt were prescribed for appellant although Dr. Fulcher did not think appellant's condition sufficiently severe to warrant a myelogram,[3] a hospital stay or cessation of appellant's desk job. Counsel testified that he relied on this latter conclusion when deciding to forego asserting the defense of physical impossibility; yet, he never consulted with Dr. Fulcher. In an affidavit accompanying appellant's post-trial motion, Dr. Fulcher stated that at the time he examined him on November 3, appellant was experiencing an acute pain attack which almost completely incapacitated him and that he was complaining about loss of his "manpower."[4] However, since appellant's previous acute attacks had subsided, Dr. Fulcher, in reaching his conclusion that appellant's condition was not "sufficiently severe," assumed that his present attack would similarly subside in time. But, Dr. Fulcher concluded, "It would have been most unlikely, if not impossible, for him to have improved very much within

1. The court alluded to the voluminous investigative reports which were transferred to counsel. I could agree, as we found in *Tillery* that the "information was all there" (*see* 419 A.2d at 973) but here as in *Tillery* counsel did not use it.

2. At one point in the hearing, counsel stated that he did not know the meaning of a neurologist's diagnosis. Additionally, he could not perceive the connection between appellant's back disorder and impotency. Expert medical testimony presented during the post-trial hearing indicated that back ailments similar to appellant's did diminish or entirely eradicate interest in performing sexual acts, especially during an acute attack of pain.

3. A myelogram is a film reproduction procedure using roentgen rays whereby the spinal subarachnoid space is visualized after an injection of a contrast medium.

4. Dr. Fulcher explained that the term "manpower" was understood to mean sexual potency.

two days of the examination." A subsequent examination of appellant performed by Dr. Fulcher on May 2, 1977, revealed that the condition of appellant's back had not returned to normal and that he was still experiencing some pain. Dr. Fulcher estimated appellant's disability at that time to be approximately fifteen percent.

Despite counsel's testimony that he decided to forego the "complex" defense of physical impossibility, the record belies that assertion. Counsel elicited testimony from appellant and his wife concerning the debilitative nature of his back condition. Additionally, the prescription for equagesic was introduced into evidence. Counsel did not, however, reinforce this line of defense by calling as witnesses either Dr. Cawood or Dr. Fulcher. Instead, he allowed the prosecution to draw negative inferences [5] from the decision not to call Dr. Fulcher, and he opened the way for the prosecution to present the damaging testimony of Dr. Fulcher's nurse concerning her recollection of appellant's condition.[6] Indeed, in his summation to the jury, the prosecutor stated:

> The defense case [is] alibi . . . plus a little suggestion of impotency . . . . Is it reasonable that, here in the courtroom, last minute, a man takes the stand and says he has this slipped disc? He diagnosed himself. Where is the doctor? The nurse . . . told you . . . [that] his chief complaint [to her], pain in the right arm, goes down into the leg and [his] toes fall asleep at times—Is this the type of injury . . . [which is] a defense to rape?

I cannot view counsel's actions as constituting a tactical choice on his part. His presentation to the jury of some testimony and physical evidence as to appellant's back condition indicates counsel's belated realization of the importance of appellant's disability. Unfortunately for appellant, counsel had not adequately prepared this line of defense as witnessed by his failure to com-

prehend the exact nature of his ailment, employ the favorable report of Dr. Cawood, contact Dr. Fulcher regarding his diagnosis of appellant's condition, or consult a medical expert as to the feasibility of the defense in light of the existing medical evidence.

His lack of preparation and presentation only served to obscure the seriousness and extensiveness of appellant's condition and to blot out an affirmative medical defense to the prejudice of appellant.

I would hold, applying the "totality of circumstances" test, that counsel's gross incompetence in his preparation, investigation and presentation of appellant's medical defense, and in failing to impeach a key government witness with highly credible evidence, has deprived appellant of his Sixth Amendment right to effective assistance of counsel. I respectfully dissent.

---

5. Several times during cross-examination, the prosecution questioned appellant concerning the whereabouts of his doctor.

6. The nurse, Mary Hughes, testified that during his November 3 office visit, appellant did not complain to her of severe back pain or impotency, but only of pain in his right hip and leg.