Sterling L. GODFREY, Appellant,

v.

UNITED STATES, Appellee.

No. 80–1205.

District of Columbia Court of Appeals.

Argued April 13, 1982.

Decided Nov. 30, 1982.

As Modified March 25, 1983.

G. Hamilton Loeb, Washington, D.C., for appellant.

Kathleen E. Voelker, Asst. U.S. Atty., Washington, D.C., with whom Charles F.C. Ruff, U.S. Atty., Washington, D.C., at the time the brief was filed, John A. Terry, Asst. U.S. Atty., Washington, D.C., at the time the brief was filed, and William J. Birney, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee.

Before MACK, FERREN, and BELSON, Associate Judges.

FERREN, Associate Judge:

Appellant raises three principal issues in appealing his convictions for pandering, D.C.Code 1973, § 22–2705, and procuring, id., § 22–2707. First, appellant claims the trial court erred in denying his motion for a new trial based on complainant's recantation of her trial testimony. We conclude that the court did not abuse its discretion in denying this motion on the ground that the recantation was incredible. Second, appellant argues, for the first time on appeal, that he was deprived of effective assistance of counsel because trial counsel failed to act when the complainant informed him—during the trial—that she wished to recant. Applying the required standard, we conclude that trial counsel's inaction constituted gross incompetence but did not blot out the essence of a substantial defense, since no reasonable juror could have believed the recantation. This argument, therefore, also fails. Finally, appellant contends that the court erred in refusing to permit impeachment of the complainant's credibility by reference to her guilty plea in an earlier case. We disagree. At issue is a guilty plea on which no judgment was entered, in contrast with a prior conviction. Such a plea does not present a proper basis for impeachment. Accordingly, we affirm the judgments of conviction.[1]

1. Appellant raises two additional arguments on appeal. First, he claims the trial court erred in permitting the government to introduce evidence of appellant's assault on the complainant. We conclude, to the contrary, that the trial court did not abuse its discretion, *see* *Willcher v. United States,* D.C.App. 408 A.2d 67, 75 (1979); *Wooten v. United States,* D.C. App., 285 A.2d 308, 309 (1971) (per curiam), in deciding that the probative value of this evidence outweighed the prejudicial effect of its admission. *See Green v. United States,* D.C. App., 440 A.2d 1005, 1007 (1982); *Tabron v. United States,* D.C.App., 410 A.2d 209, 214 (1979); *Drew v. United States,* 118 U.S.App. D.C. 11, 16, 331 F.2d 85, 90 (1964). The assault showed that appellant exerted control over complainant when she tried to leave him. This evidence was relevant to the issue of appellant's intent to coerce complainant to engage in prostitution. *See Willcher, supra* at 76; *Drew, supra* 118 U.S.App.D.C. at 16, 331 F.2d at 90.

Second, appellant claims the court erred in denying his motion for a judgment of acquittal on the procuring charge or, in the alternative, in failing to characterize the pandering charge as a lesser included offense of procuring. We disagree. The record contains sufficient evidence to support a finding that appellant received money from "arranging for" complainant to have sex for money. *See* D.C.Code 1973, § 22–2707 (procuring). According to complainant's testimony, appellant drove her to 14th Street on several occasions and introduced her to the woman who "showed her the ropes." Appellant's alternative argument on merger also fails. "Where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of a fact which the other does not." *Woody v. United States,* D.C.App., 369 A.2d 592, 595 (1977). To convict appellant of procuring, the government had to prove that he actually received money from arranging for complainant to have sex on at least one occasion. To convict appellant of pandering, the

## I. *Facts and Proceedings*

In support of its charges, the government relied to a significant extent on the trial testimony of complainant, a twenty-year old native of Bermuda.[2] She testified that she came to the District of Columbia in October 1978 to join her fiancé, Leroy Henry, whom she had met in New York. After complainant arrived, Henry asked her to engage in prostitution to support his drug habit. She refused; they fought; and he abandoned her in the District without any money. Complainant decided to return to Bermuda.

Just before her planned departure, complainant visited an acquaintance, Mike Ford, who introduced her to appellant, Sterling Godfrey. Complainant told appellant what had happened to her. He offered to help, paid for her hotel, and brought her back to his apartment in Maryland. She accompanied appellant when he visited his mother in Virginia for a few days, and complainant had sexual relations with him.

After returning from Virginia, appellant told complainant that he was a pimp and that if she liked him or "wanted to be about him" she should try prostitution. He added that he would help her go back home to Bermuda if that was what she wanted to do. A few days later, appellant again suggested that complainant try prostitution. She agreed. Appellant drove complainant to the District, where he introduced her as "his lady" to a prostitute that he knew. This woman told complainant about the rules of the "trick house," what to charge, and how to approach men while avoiding plainclothes police. Complainant earned between $95 and $100 that night and gave appellant all the money.

The next night, November 2, 1978, appellant took complainant to 14th and "P" Streets. She solicited a police officer, Wesley Gibson, who arrested her.[3] When asked where she lived, complainant gave appellant's address. After her release, appellant met her and they spent the evening talking over her feelings about the arrest. The next night, appellant told complainant that if she ever were going to go back out on the street, she should go then. Complainant returned to the street. She continued to solicit until five nights later, when she was arrested again. Complainant gave the police a false address as appellant, after the first arrest, had instructed her to do. On December 4, 1978, complainant was arrested a third time.[4]

While working as a prostitute, complainant made up to $110 per night, although on some nights she made nothing. She usually left the money for appellant on his dresser, but, on several occasions, she gave him the money directly. He provided her with clothes and money for food.

During the period November—December 1978, appellant sent complainant to Florida and Canada with the understanding that she would work there as a prostitute. Complainant did not engage in prostitution on these trips, however, and, while in Canada, she called appellant to tell him she was quitting. Appellant told her that either she could come home or he would come to Canada to get her. Complainant returned to the District of Columbia.

After her return, appellant told her that she was not "street material" and arranged for her to go to Atlanta to be trained to pick pockets and rob hotel rooms. Complainant was not successful and returned to the District. Complainant moved back in with appellant and resumed work as a prostitute. She indicated, however, that she had not wanted to do so. When asked why she did, she replied, "[T]o be a part of [appellant] you have to be a part of the street." She added that, at the time, "I knew I loved him."

---

government had to prove that he induced or coerced complainant to engage in prostitution, not merely that he facilitated or arranged for an act that she, herself, elected to do.

2. Several police officers corroborated portions of complainant's testimony.

3. Officer Gibson corroborated this testimony.

4. On the occasion of each arrest, complainant was provided with private counsel whom she did not retain. Appellant denied that he provided her with counsel.

On several occasions, complainant moved out of appellant's apartment for a few days. Eventually, in March 1979, she decided to make a permanent break. She stopped by to pick up her belongings and talked with appellant. He became enraged and beat her with a pipe, a bottle, and a hammer until her legs were numb. During the next three days, complainant did not leave the house because she was too sore to stand. When appellant went out on the third day, complainant called the police. They took her to the hospital and then sent her to a shelter for battered women.[5] Complainant returned to Bermuda after she left the shelter. She came back to the United States for the trial.[6] Complainant testified that she never had engaged in prostitution except when she was with appellant between October 1978 and March 1979.

Appellant took the stand in his own defense.[7] He testified that he met complainant in the fall of 1978 through Mike Ford. He told complainant that he did not want to have a relationship with her or anyone else. He also told her that he was on parole for pandering and racketeering and that he was no longer involved in these illicit activities. At this time, he showed her newspaper clippings of stories about his arrest.[8] Appellant further testified that, soon after meeting complainant, he took her with him on a trip to his mother's in Virginia. She lived with him, on-and-off, until December 1978. Appellant claimed that he asked complainant to leave his apartment because she was always getting into trouble, but he admitted that he let her move back in later.

Appellant denied complainant's allegations that he had arranged for her to engage in prostitution or taken money from her. He admitted that complainant stayed with him once when she was injured. He claimed that one morning, at 2:30 a.m., she appeared at his door, suffering from injuries, and he let her stay.

On cross-examination, the prosecutor impeached appellant with his prior convictions. The prosecutor also questioned appellant about the jobs he had held after his release from the Atlanta Federal Penitentiary in June 1977. Appellant worked for about six months for a company that managed musicians' bands. He then worked as a salesman for a company that converted van interiors and earned between six and eight hundred dollars per month. During this period, appellant paid $283 as monthly rental for his apartment. Appellant claimed that he made loans to complainant and paid for her collect phone calls to him[9] but that he never took money from her. Appellant, nonetheless, amassed a considerable amount of money by the end of 1979. During that summer, appellant opened his own business of selling cycles. Between May and October, 1979, appellant deposited over twenty-five thousand dollars into his business checking account. At the time of his arrest, appellant was carrying $2,008. Appellant was not asked, nor did he explain, how he earned so much.

Appellant rejected complainant's testimony and said that he never had taken her down to 14th Street or picked her up downtown. Nor had he: taken money she had earned on the street, met her when she left

---

5. Three police officers, Wesley Gibson, Michael O'Connell, and Russell Tadesco corroborated the existence of appellant's injuries.

6. Complainant had returned to the United States in the fall of 1979 to obtain her high school equivalency diploma and to receive training in data processing. She was living in Bermuda when she received notice of trial.

7. Appellant also called two witnesses, Charles A. Fenwick, Jr., who testified concerning appellant's employment history, and Clayton Johnson, who testified that he had met complainant once when she was with appellant.

8. On cross-examination, appellant admitted that these articles outlined the luxurious lifestyle he had led before his conviction and pictured him in a full-length, white fur coat. In addition, he acknowledged that at least one newspaper, the Washington Post, characterized him as "king of the pimps."

9. Appellant admitted that one month, when complainant was calling from Bermuda, he paid for almost seven hundred dollars in calls from her.

the courthouse after her arrest, arranged for her lawyer, given her a false address to use in case of arrest, or given her money to go to Tampa, Toronto, or Atlanta. Nor had he beaten her. He claimed that he did not know she had engaged in prostitution until after her first arrest.

The jury found appellant guilty of both charges, obviously crediting the complainant's trial testimony, not appellant's.

The testimony relevant to our inquiry is not limited to that presented to the jury. It also includes statements, in evidence at the hearing on the motion for a new trial, that complainant made to counsel for the defense and for the government during the last days of trial and jury deliberation. On July 4, 1980,[10] after two days of trial, complainant told defense counsel[11] that she wished to recant her previous testimony.[12] At first, defense counsel told her to show up to testify on July 7. He called her on July 5, however, and told her that he did not wish to risk criticism for attempting to influence a government witness and, therefore, he could not use her testimony.

On the afternoon of July 8, while the jury deliberated, complainant told the prosecutor that she had testified falsely at trial.[13] The prosecutor, then engaged in another trial, spoke with complainant for about half an

hour. The government has represented that the prosecutor immediately consulted his supervisors in the United States Attorney's office and that the supervisors made the decision not to inform the court about the recantation until after the jury had reached a verdict.[14] The prosecutor did, however, during jury deliberations, inform defense counsel of complainant's desire to recant.

On July 15, 1980,[15] appellant filed a motion for a new trial based on complainant's recantation of her testimony.[16] Counsel included an affidavit of complainant, in which she repudiated her trial testimony and presented another version of her activities in the fall of 1978 and winter of 1979. On September 12, 1980, the court held a hearing at which complainant testified. Two weeks later, the court denied the motion. The court sentenced appellant to two consecutive terms of 20 to 60 months in prison. Appellant timely noted his appeal. *See* D.C.Code 1973, § 11–721(a)(1); D.C.App.R. 4 II(b)(1).

II. *Motion for a New Trial Based on Complainant's Recantation of Trial Testimony*

At the July 15 hearing, appellant argued for a new trial based on "newly discovered evidence" and the "interest of justice."[17]

---

**10.** Complainant testified that she first spoke with defense counsel concerning the recantation on July 3, 1980. In her affidavit, however, complainant stated that this conversation occurred on July 4, 1980. Counsel indicated that he first spoke with complainant about her desire to recant on July 4.

**11.** Counsel on appeal did not represent appellant at trial.

**12.** Complainant testified, at the hearing on the motion for a new trial, that she offered to recant after she saw appellant and he refused to speak with her. She asked appellant to connect her with his lawyer so that she could tell him that she had testified falsely at trial.

**13.** Complainant testified that before she went to the prosecutor's office, Officer Gibson called her and told her that she could be charged with perjury, and appellant could be charged with tampering with a government witness, if she took the stand to recant.

**14.** The prosecutor told complainant, during their initial meeting, that he would discuss the recantation later. He met with complainant the next evening and talked with her for almost five hours. He concluded that her trial testi-

mony was true and that the verdict should stand.

**15.** On July 10, 1980, appellant's counsel made an oral request for a new trial. The court instructed him to file the motion in writing. Counsel did so within seven days after verdict, as Super.Ct.Cr.R. 33 requires for new trial motions based on "the interest of justice."

**16.** Appellant also based this motion on the trial court's admission of testimony concerning appellant's assault on complainant and on the trial court's instruction on pandering. See note 1 *supra*.

**17.** Super.Ct.Cr.R. 33 provides:
The Court on motion of a defendant may grant a new trial to him if required in the interest of justice. If trial was by the Court without a jury the Court on motion of a defendant for new trial may vacate the judgment if entered, take additional testimony, and direct the entry of a new judgment. A motion for a new trial based on the ground of newly discovered evidence may be made only before or within 2 years after final judgment, but if an appeal is pending, only on remand of the case may the Court grant the motion. A motion for a new trial based on any other

He claimed that the jury premised his convictions on false testimony, and that if the jury had heard complainant's recantation, it probably would have acquitted. The trial court denied the motion because the recantation was not "newly discovered" and, in any event, was not credible.

Appellant no longer argues that the recantation (which took place during trial) was "newly discovered." He claims, however, that the trial court abused its discretion in denying the new trial motion on the other proffered ground: "the interest of justice."

■ When a defendant, as in this case, makes a new-trial motion "within 7 days after verdict," the court may order a new trial "in the interest of justice." Super.Ct. Cr.R. 33, note 17 *supra*. Because the motion must be filed so soon after trial, substantially unaffected by the usual considerations favoring finality of judgments, this standard is "more lenient" than the one applicable to a motion based on newly discovered evidence, which can be filed as late as two years after final judgment. *Sellars v. United States*, D.C.App., 401 A.2d 974, 979 (1979); *see Brodie v. United States*, 111 U.S.App.D.C. 170, 172–73, 295 F.2d 157, 159–60 (1961); *Benton v. United States*, 88 U.S.App.D.C. 158, 160, 188 F.2d 625, 627 (1951).[18]

■ In evaluating "the interest of justice," the trial court—sitting " 'as a thirteenth juror,' " *Brodie, supra* 111 U.S.App. D.C. at 173, 295 F.2d at 160 (citation omitted)—determines whether a " 'fair trial requires that the [evidence] be made available to the jury.' " *Id.* (quoting *Benton, supra* 88 U.S.App.D.C. at 160, 188 F.2d at 627).[19] The question thus becomes: in order to achieve the juror's viewpoint, what criteria does the trial court apply?

Appellant argues that, in order not to invade the province of the jury, the trial court must: assume a reasonable jury could believe the recantation, evaluate "whether the remainder of the record, disregarding the recanted testimony, supports the guilty verdict," and, if not, grant a new trial. Appellant accordingly suggests that the court abused its discretion in making its own assessment that the recantation was incredible.[20]

■ The government argues, to the contrary, that the trial court itself is to determine credibility; and, only if the court credits the recantation, must it then apply one of the tests traditionally used to evaluate jury impact: whether (1) the recantation "would *probably* produce an acquittal

---

grounds shall be made within 7 days after verdict or finding of guilty or within such further time as the Court may fix during the 7-day period.

18. Under Super.Ct.Cr.R. 33, the well-established requirements for granting a new trial motion, made "within two years after final judgment" based on "newly discovered evidence," are as follows:

(1) the evidence must have been discovered since the trial; (2) the party seeking the new trial must show diligence in the attempt to procure the newly discovered evidence; (3) the evidence relied on must not be merely cumulative or impeaching; (4) it must be material to the issues involved; and (5) of such nature that in a new trial it would probably produce an acquittal.

*(William) Thompson v. United States*, 88 U.S. App.D.C. 235, 236, 188 F.2d 652, 653 (1951); *accord Heard v. United States*, D.C.App., 245 A.2d 125, 126 (1968) (the *Thompson-Heard* criteria).

19. The "interest of justice" standard is applicable to motions filed within seven days after verdict, whether the evidence was newly discovered during that period or, as here, available to appellant during trial. *See Sellars, supra* at 979; *Benton, supra* 88 U.S.App.D.C. at 160, 188 F.2d at 627.

20. In his brief, appellant also states "the trial court found that the recantation would have affected the outcome of the verdict had it been presented to the jury." The trial court did not make such a finding (which would have been inconsistent with its finding that the recantation was incredible). The court instead found:

There is no doubt that *if* the Court accepts the recantation that it would be material evidence. It would not be cumulative. It would not be impeaching and ... it would probably result either in an acquittal or more likely in new prosecution .... The real issue for the Court is the recantation and whether the Court accepts the recantation. [Emphasis added.]

in the event of a retrial," *Nowlin v. United States,* D.C.App., 382 A.2d 9, 14 n. 7 (1978) (dicta) (emphasis added),[21] or, less conclusively, (2) "without it the jury *might* have reached a different conclusion." *Larrison v. United States,* 24 F.2d 82, 87–88 (7th Cir.1928).[22] We agree with the government.[23] Traditionally, moreover, the trial court determines credibility of a recanta-

tion, whether the motion is based on the interest of justice[24] or on newly discovered evidence.[25] We therefore turn to the question whether the record supports the trial court's finding that complainants' recantation was highly incredible and thus not a proper basis for a new trial.[26] If that finding is sustainable, we need not resolve whether, "in the interest of justice," the

**21.** In *Nowlin, supra* at 14 n. 7, where we held that *res judicata* barred a new trial, we stated, in dicta, with respect to a post-trial recantation of a material witness (which was the subject of a motion based on newly-discovered evidence) that the court must determine: "(1) whether the recantation is indeed 'newly discovered' evidence; (2) whether the evidence is material and not cumulative or impeaching; and (3) whether the recantation is of such nature that it would *probably* produce an acquittal in the event of a retrial." (Emphasis added.) Thus, in one context, we applied our traditional *Thompson-Heard* criteria to a recantation. *See* note 18 *supra.*

**22.** *Larrison, supra,* is the predominant rule of the federal circuits governing new trial motions based on newly discovered recantations. *Larrison's* criteria are:
(1) The court is reasonably well satisfied that the testimony given by a material witness is false.
(2) That without it the jury *might* have reached a different conclusion.
(3) That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial. [*Id.* at 87–88.] (Emphasis in original).
*Accord United States v. (Henry) Wright,* 625 F.2d 1017, 1020 (1st Cir.1980); *United States v. Wallace,* 528 F.2d 863, 866 (4th Cir.1976); *United States v. Festa,* 513 F.2d 1313, 1317 (2d Cir.), *cert. denied,* 423 U.S. 841, 96 S.Ct. 72, 46 L.Ed.2d 60 (1975); *United States v. (James) Johnson,* 487 F.2d 1278, 1279 (4th Cir.1973) (per curiam); *United States v. Meyers,* 484 F.2d 113, 116 (3d Cir.1973); *Newman v. United States,* 238 F.2d 861, 862 n. 1 (5th Cir.1956); *United States v. Troche,* 213 F.2d 401, 403 (2d Cir.1954); *Gordon v. United States,* 178 F.2d 896, 900 (6th Cir.1949), *cert. denied,* 339 U.S. 935, 70 S.Ct. 664, 94 L.Ed. 1353 (1950). *Contra United States v. Krasny,* 607 F.2d 840, 844–45 (9th Cir.1979), *cert. denied,* 445 U.S. 942, 100 S.Ct. 1337, 63 L.Ed.2d 775 (1980); *United States v. Stofsky,* 527 F.2d 237, 245–46 (2d Cir.1975), *cert. denied,* 429 U.S. 819, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976).

**23.** Appellant cites three cases to support his argument that a trial judge must grant a new trial where the sole prosecution witness recants

under oath. While we are not bound by any of the cases he cites, we conclude that they do not support his claim. The first, *Solis v. State,* 262 So.2d 9 (Fla.Dist.Ct.App.), *cert. denied,* 265 So.2d 9 (Fla.1972) was overruled in *Mollica v. State,* 374 So.2d 1022, 1026 (Fla.Dist.Ct.App. 1979) (per curiam), *cert. denied,* 386 So.2d 639 (Fla.1980). The second case, *Commonwealth v. Krick,* 164 Pa.Super. 516, 520, 67 A.2d 746, 749 (1949), merely states that the trial court may not base its credibility finding on evidence outside the record. The third case, *State v. Bassett,* 93 N.H. 62, 35 A.2d 388 (1943) does not support appellant's broader claim but holds only that the trial court must conduct a hearing to determine how a recantation would have affected the verdict.

**24.** *See Brodie, supra* 111 U.S.App.D.C. at 173, 295 F.2d at 160 (on motion for new trial in the interest of justice, "the court sits as a thirteenth juror") (citation omitted); *United States v. (William) Johnson,* 327 U.S. 106, 112, 66 S.Ct. 464, 466, 90 L.Ed. 562 (1946) (trial court must weigh credibility of post-trial recantation to determine whether trial achieved substantial justice).

**25.** *See, e.g., Festa, supra* at 1317; *(James) Johnson, supra; United States v. (Johnny) Coleman,* 460 F.2d 1038 (8th Cir.) (per curiam), *cert. denied,* 409 U.S. 871, 93 S.Ct. 200, 34 L.Ed.2d 122 (1972); *United States v. Nolte,* 440 F.2d 1124, 1128 (5th Cir.), *cert. denied,* 404 U.S. 862, 92 S.Ct. 49, 30 L.Ed.2d 106 (1971); *United States v. Schoepflin,* 442 F.2d 407 (9th Cir. 1971) (per curiam); *Newman v. United States,* 238 F.2d 861, 862 (5th Cir.1956); *Troche, supra* at 401, 403; *Gordon, supra* at 900.

**26.** The trial court should not have to grant a new trial on the basis of an unsubstantiated recantation, since witnesses may recant for numerous reasons that have nothing to do with furthering truth or justice. *See, e.g., Huggins v. United States,* D.C.App., 333 A.2d 385, 387 (1975). Certainly, if "the circumstances surrounding the recantation suggest it is the result of coercion, bribery, or misdealing the [trial court] is justified in disregarding it." *(James) Johnson, supra* at 1279.

*Nowlin (Thompson-Heard)* or *Larrison* rule should apply.[27]

▮▮▮ Specifically, in ruling on the motion, the court stated:

I do not accept the complaining witness' recantation. I have viewed her and observed her demeanor and weighed her credibility extensively. I heard her testimony at trial. I heard extensive cross-examination at trial. I heard her the second time round on the motion, and heard her extensive cross-examination by the prosecutor that time around.

I am not satisfied that her trial testimony was false and not only am I not satisfied based on my evaluation of all the factors which I will spell out in a second, I don't believe that her testimony at trial was false. . . .

The judge gave five reasons for her determination that the recantation was not credible: (1) complainant's feelings for appellant provided a motive for false recantation; (2) there was independent corroboration of complainant's trial testimony; (3) complainant's trial testimony was consistent with her Grand Jury testimony; (4) complainant came from Bermuda to testify at trial voluntarily; and (5) complainant's demeanor at trial led the court to believe she was telling the truth, while her demeanor at the new trial hearing convinced the court she was lying.

We will reverse the court's ruling on the credibility of the trial testimony and recantation only if it is wholly unsupported by the evidence. *United States v. (William) Johnson,* 327 U.S. 106, 112, 66 S.Ct. 464, 466, 90 L.Ed. 562 (1946). *See also United States v. Festa,* 513 F.2d 1313, 1319 (2d Cir.), *cert. denied,* 423 U.S. 841, 96 S.Ct. 72, 46 L.Ed.2d 60 (1975) (applying clearly erroneous standard). The record supports the trial court's ruling. We conclude, accordingly, that the court did not abuse its discretion in denying the motion for a new trial.

### III. Ineffective Assistance of Counsel Claim

▮▮▮ Appellant claims that he was denied effective assistance of counsel because his trial attorney failed to interview complainant after she told him that she wished to take the stand to recant, and because he failed to put complainant on the stand. We agree that counsel should have interviewed the complainant—and was grossly incompetent in failing to do so—but we conclude that counsel's gross incompetence does not mandate reversal of appellant's convictions, since no reasonable juror could have found the recantation credible.[28]

▮▮▮ When a defendant brings a post-trial claim of ineffective assistance of counsel,[29] we will reverse the conviction only if "there has been gross incompetence of counsel and that this has in effect blotted out the essence of a substantial defense." *Gaston v. United States,* D.C.App., 442 A.2d 958, 961 (1982) (quoting *Angarano v. United States,* D.C.App., 312 A.2d 295, 298 n. 5 (1973), *reh'g en banc denied,* 329 A.2d 453

**27.** Neither the Supreme Court, the United States Court of Appeals for the District of Columbia Circuit, nor this court has explicitly resolved whether the *Larrison* or *Thompson-Heard* rule should apply when a defendant seeks a new trial based on evidence of a recantation (newly discovered or otherwise). *See (William) Johnson, supra* 327 U.S. at 111 n. 5, 66 S.Ct. at 466 n. 5; *United States v. Mackin,* 183 U.S.App.D.C. 65, 68, 561 F.2d 958, 961, *cert. denied,* 434 U.S. 959, 98 S.Ct. 490, 54 L.Ed.2d 319 (1977). In *Nowlin, supra,* while adapting *Thompson-Heard* to a particular recantation, *see* note 21 *supra,* this court did not consider whether *Larrison* should apply. *See Nowlin, supra* at 14 n. 7 (dicta).

**28.** In denying appellant's new trial motion, the trial judge herself acted " 'as a thirteenth juror,' " *Brodie, supra* 111 U.S.App.D.C. at 173, 295 F.2d at 160 (citation omitted), and found the recantation incredible. In reviewing appellant's ineffective assistance claim, however, we

must evaluate whether *any* reasonable juror could have found the recantation credible. If counsel had brought a new trial motion before the trial court based on ineffective assistance of counsel, that court would have had to apply this same test.

**29.** When a defendant raises an ineffectiveness claim pretrial, we employ the standard of review set forth in *Monroe v. United States,* D.C.App., 389 A.2d 811, 818–19, *cert. denied,* 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978). *Gaston v. United States,* D.C.App., 442 A.2d 958, 961 (1982); *Oesby v. United States,* D.C.App., 398 A.2d 1 at 3 n. 3 (1977). According to *Monroe,* a defendant is entitled to new counsel if, after an inquiry, the trial court determines that defendant's counsel is not providing representation "within the range of competence demanded of attorneys in criminal cases." *Id.* at 819 (quoting *McMann v. Richardson,* 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970)).

(1974)); *accord Bruce v. United States,* 126 U.S.App.D.C. 336, 339–40, 379 F.2d 113, 116–17 (1967).

 Normally, a criminal defendant should present a claim of ineffective assistance of counsel under D.C.Code 1981, § 23–110 or under Super.Ct.Cr.R. 33, so that the defendant can bring before the court evidence outside the trial record. *Proctor v. United States,* D.C.App., 381 A.2d 249, 252 (1977); *see (Earl) Coleman v. United States,* D.C.App., 379 A.2d 710, 713 (1977); *Angarano, supra,* 329 A.2d at 458; *United States v. (Benjamin) Thompson,* 154 U.S.App.D.C. 347, 347–48, 475 F.2d 931, 931–32 (1973) (per curiam). Here, appellant presents the issue on direct appeal.[30] We need not defer consideration of his claim, however, because the record of the hearing on appellant's motion for a new trial includes trial counsel's explanation of why he did not interview complainant and call her to testify for the defense:

> Defense counsel telephoned [complainant] on July 5th to inquire about [her decision to recant] and to arrange for an interview. The latter would have to be an extended one and was obviously necessary, in order to be quite sure of what [complainant] intended to do. The Defendant could not afford to have so important a witness break down in front of the jury with effects possibly more prejudicial than those of [her] first appearance.

> Defense counsel's tendency toward a cautious approach was strengthened when [complainant] informed him during the July 5th telephone conversation that she would have to be in court on July 7th, in any event, as a potential rebuttal witness for the Government.

> This left the prospect of a long interview with a party who appeared during trial to have an enigmatic personality and

> who was still a Government witness. Counsel had no way of assessing before the interview whether [complainant] had some understanding with the police or the depth of her sincerity. There was always the possibility of repercussions in the form of criticism for attempting to influence a Government witness.

> Counsel informed [complainant] that he did not believe he could make use of her proffered testimony in view of her current status. By Monday, July 7th, the subject appeared to be closed.

> On July 8th, however, [complainant] decided to take the matters into her own hands, and the Court has been fully informed of the results.

 Counsel was correct in concluding that the nature and credibility of complainant's recantation would determine whether he should call her as a witness. He recognized that she was critical to the government's case, and that he would need to interview her in order to assess the strength of her recantation. But counsel failed to interview complainant. He violated his "duty to conduct an independent investigation of the facts and circumstances" of the case. *(Jimmy) Johnson v. United States,* D.C.App., 413 A.2d 499, 503 (1980) (citing *Oesby v. United States,* D.C.App., 398 A.2d 1, 8 n. 14 (1977)); *accord Tillery v. United States,* D.C.App., 419 A.2d 970, 973 (1980). "Proper investigation is particularly crucial where the central issue is a question of credibility between the key government witness and the defendant." *(Jimmy) Johnson, supra* at 503 (citation omitted). Counsel's fear that the interview might be lengthy, or that he might risk accusations of witness tampering, does not excuse his inaction. Counsel could—indeed should—have notified the court that the witness told him she wished to repudiate her trial testimony.[31] He could have arranged for trial

---

**30.** At the hearing on the motion for a new trial, appellant did not raise an ineffectiveness claim. He was still represented by trial counsel at that time. See note 11 *supra.*

**31.** In this connection, we note that the prosecutor, by relaying to defense counsel complainant's desire to recant, made "timely disclosure to counsel for the defendant . . . of the existence of evidence, known to the prosecutor . . . , that tends to negate the guilt of the accused. . . ." DR [Disciplinary Rule] 7–103(B). *Accord* ABA Standards Relating to the Prose-

cution Function, Standard 3.11 (Approved Draft 1971). The prosecutor also informed his supervisors, but they decided not to inform the court of complainant's desire to recant until after the jury had reached its verdict.

The Supreme Court has noted that the United States Attorney's Office has a

> duty to bring to the attention of the court or of proper officials all significant evidence suggestive of innocence or mitigation. At trial this duty is enforced by the requirements of due process, but after a conviction the prosecutor also is bound by the ethics of

court supervision of his interview if the court shared his concerns. Counsel's failure to interview complainant—the crucial government witness—after she had offered to recant amounted to gross incompetence.

■ We will not reverse appellant's convictions, however, based on counsel's gross incompetence alone. Appellant also must show that this incompetence blotted out a "substantial defense". *Angarano, supra*, 312 A.2d at 298 n. 5. "The showing requires the appellant to meet a 'heavy burden of proving prejudice' ". *(Jimmy) Johnson, supra* at 504 (citing *Thornton v. United States*, D.C.App., 357 A.2d 429, 435, *cert. denied*, 429 U.S. 1024, 97 S.Ct. 644, 50 L.Ed.2d 626 (1976)).

■ A substantial defense is not limited to presentation of an alternative theory-of-the-case but includes admission of evidence that substantially will discredit the government's case-in-chief. *Asbell v. United States*, D.C.App., 436 A.2d 804, 807 (1981). A substantial defense is lost if counsel fails to "impeach a key government witness with highly credible evidence," *(Jimmy) Johnson, supra* at 504, including inconsistent statements made before trial, *Asbell, supra* at 807, or during trial after the witness has testified. If complainant's recantation was credible, therefore, appellant would be entitled to reversal of his convictions. *Compare*

*Harris v. United States*, D.C.App., 441 A.2d 268, 271–73 (1982) (failure to interview and call neighbor who would corroborate appellant's testimony) *and Asbell, supra* at 806–07 (failure to impeach eye witness with his previous weak identification of appellant) *and Tillery, supra* at 973 (failure to impeach government's medical expert with medical record) *and (Jimmy) Johnson, supra* at 505 (failure to impeach complainant with her medical record and testimony of her physician) *with Gaston, supra* at 962 (neither medical evidence nor metallurgist testimony "constitute[d] highly credible evidence that would have seriously impeached the complainant's credibility").

If we were to perceive that a reasonable juror might have found the recantation credible, we would be compelled either to accept appellant's claim of ineffective assistance or at least to remand for the trial court, which witnessed the demeanor, to assess what a reasonable juror might have done. The trial court found, however, that complainant's recantation was not credible, and our own review of the record sustains that finding. Although we may not "substitut[e] ourselves for a jury deprived of material defense evidence that was available to defense counsel at the time of trial," *Asbell, supra* at 811, we conclude that no reasonable juror could have accepted complainant's recantation.[32]

his office to inform the appropriate authority of after-acquired or other information that casts doubt upon the correctness of the conviction.

*Imbler v. Pachtman*, 424 U.S. 409, 427 n.25 (1976); *cf. United States v. Kelly*, 543 F.Supp. 1303, 1311 (D.Mass.1982) (court chastised prosecutor who told neither court nor defense counsel about false testimony). The Court, however, has not made clear whether, apropos of DR 7–103(B) and ABA Standard 3.11, this duty is satisfied by bringing recantation evidence *only to the attention of defense counsel*, as a "proper official," *id.*, or whether the duty, under the circumstances, also would require disclosure to the trial court.

We are troubled by the decision of the United States Attorney's office not to inform the court immediately about the recantation of its principal witness, especially because the jury was deliberating and time obviously was of the essence. *In deciding not to inform the court, the* government had to conclude that no fraud would be perpetrated upon a tribunal. *See* DR 7–102(B). While we do not address all contexts of exculpatory or mitigating evidence that comes to the prosecutor's attention during trial,

we conclude that, for the future, the prosecutor should report all recantations of its witnesses' testimony, while trial is in progress, directly to the court as well as to defense counsel. Especially in a case such as this, where the jury has retired, the court is the "proper official" to determine what effect, if any, a recantation is likely to have on the jury's verdict. The court, not the parties, should decide whether the jury first should reach a verdict, followed by a post-trial hearing on the recantation issue, or instead should suspend deliberations while the court holds a hearing to determine whether the jury should hear additional evidence consisting of the recantation and any related testimony.

**32.** Normally, we would remand the case for the trial court to assess whether a reasonable juror might believe the recantation, for the court would need to assess demeanor in making its determination. Here, however, the trial court already has issued findings as to complainant's demeanor at the two hearings, and the weakness of the recantation is clear from the written record. Since no further factual findings are necessary, we see no reason to remand the case or to require appellant to raise the same claim collaterally under D.C.Code 1981, § 23–110.

The trial court addressed the recantation as follows:

[T]he Court observed [complainant's] demeanor very carefully at trial and at the hearing.

At trial it is fair to say that while [complainant] had her shaky moments when she first saw [appellant] during voir dire and during some points in her direct testimony, significantly during close cross-examination . . ., [complainant] was not in any way impeached on cross-examination. Her testimony wasn't undermined. She did not fall apart at the seams emotionally. Both direct and cross certainly dealt with very emotional issues and she was a totally credible witness as the jury obviously found.

On the date that she presented her recantation testimony to the Court, she presented a substantially different appearance which is perhaps hard to verbalize, but in toto, she certainly did not impress this Court as a credible or believable witness at the recantation hearing— excuse me [at] the hearing for new trial.

For all the reasons that I have spelled out in assessing credibility, I do not accept her recantation. I am not satisfied that her trial testimony was false.

The record supports the trial court's findings. At the hearing on the motion for a new trial, complainant testified that she had worked as a prostitute in New York massage parlors before she met appellant. After she had begun living with him, she asked if he knew anything about 14th Street. He said he did not want to get involved because of his parole and showed her his newspaper clippings. See note 8 *supra.* Complainant's former fiancé provided her with names of persons working on 14th Street, as well as with directions how to get there. Although complainant discussed prostitution with appellant, she claimed that he was "not instrumental in getting her there," he did not manage her business as a prostitute, and she did not give him the proceeds from this work.[33]

Complainant's testimony on direct examination at the new trial hearing was much less clear than her testimony at trial. In particular, it lacked a sense of chronology, and complainant was impeached severely on cross-examination. She contradicted herself in discussing when she moved out of appellant's home, she could provide few specifics about her alleged work in New York massage parlors, and she was unsure of many of the details she did provide. She admitted that working as a street prostitute was different from working in a massage parlor, but she claimed she was able to start out completely on her own, getting advice from a woman, Carol, whose name a man named Henry had given her.[34] She said she gave appellant money only to cover her expenses but admitted that neither of them ever did an accounting to determine the amount of these expenses. She also admitted that she worked as a prostitute for several months before she opened a bank account, but she denied that she turned her money over to appellant. She claimed she spent it all on clothes. She did not deny that she told several police officers that appellant beat her up because she wished to quit prostitution. She claimed, however, that she made up that story to get back at appellant because she realized their relationship would not work. She also admitted that she testified before the grand jury and at trial that appellant had taken her down to 14th Street and introduced her to a prostitute who "showed her the ropes."

Presentation of this weak recantation would not have aided the defense but would have bolstered the government's argument that appellant manipulated complainant for his own benefit. *Cf. (Carlton) Wright v. United States,* D.C.App., 387 A.2d 582, 586 (1978) (introduction of half-way house records would have exposed jury to the fact that appellants lived together and thus would have weakened appellant's alibi defense). Counsel's failure to present the recantation to the jury, therefore, did not blot out the essence of a substantial defense.

---

**33.** Complainant said that she did give appellant money but only to repay loans and to cover her expenses.

**34.** Appellant testified that she found Carol, whom she had never met before, in a bar: "I talked to her for a minute. And I told her about Leroy. As a matter of fact, I guess I

even gave her some indication that I may have still been with Leroy. I did indicate to her that I was still with Leroy. I would say that." Even without the benefit of direct evidence of complainant's demeanor, we believe it is clear that appellant was making up part of her story as she went along.

## IV. Impeachment of Complainant with her Criminal Record

■ Appellant argues that the trial court erred in refusing to permit him to impeach complainant with her New York criminal record. We conclude that the court properly barred this cross-examination because complainant was never "convicted" of a crime in New York.

In 1977, complainant entered a plea of guilty to possession of a weapon. According to complainant, when she last appeared before the court in that case the court "was considering placing [her] on three years' probation. But that would be pending a social inquiry." The court never conducted the inquiry because complainant returned to Bermuda. At the time of appellant's trial, there was no warrant outstanding for complainant. The New York case appeared closed even though the court never had sentenced complainant.

In the District of Columbia, a party may impeach a witness by the admission of the witness' prior conviction. D.C.Code 1973, § 14–305(b)(1);[35] United States v. Lee, 166 U.S.App.D.C. 67, 72, 509 F.2d 400, 405, cert. denied, 420 U.S. 1006, 95 S.Ct. 1451, 43 L.Ed.2d 765 (1975); see Hill v. United States, D.C.App., 434 A.2d 422, 428–29 (1981), cert. denied, 454 U.S. 1151, 102 S.Ct. 1020, 71 L.Ed.2d 306 (1982). "Under our decisions this obviously requires a 'conviction', i.e., a judgment of conviction and sentence, and a mere plea of guilty is insufficient." Lee, supra, 166 U.S.App.D.C. at 72, 509 F.2d at 405; see Crawford v. United States, 59 U.S.App.D.C. 356, 357, 41 F.2d 979, 980 (1930); see also United States v. Fox, 154 U.S.App.D.C. 1, 6, 473 F.2d 131, 137 (1972) (arrest insufficient); Sanford v. United States, 69 U.S.App.D.C. 44, 46, 98 F.2d 325, 327 (1938) (per curiam) (arrest or indictment insufficient).

Here, complainant was never convicted or sentenced. We decline to permit admission of her guilty plea, without more, because the plea lacks the trustworthiness and finality of a conviction.[36] See United States v. Klein, 560 F.2d 1236, 1241 (5th Cir.1977), cert. denied, 434 U.S. 1073, 98 S.Ct. 1259, 55 L.Ed.2d 777 (1978).[37]

Appellant argues that the disposition of the New York charges against complainant is equivalent to a sentence, because in United States v. Hinkle, 160 U.S.App.D.C. 394, 492 F.2d 660 (1974), the court held that commitment for a study under the Federal Youth Corrections Act, 18 U.S.C. § 5010(e), constituted imposition of a sentence. Id. 492 F.2d at 661. Appellant equates the New York court's order of a social inquiry with a commitment for a § 5010(e) study. We disagree. Complainant was not "committed" for a social inquiry; she was not placed in court custody. In fact, after she left the jurisdiction, no warrant was issued

---

**35.** D.C.Code 1973, § 14–305(b)(1) provides in part:

> [F]or the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a criminal offense shall be admitted if offered, either upon cross-examination of the witness or by evidence aliunde, but only if the criminal offense (A) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, or (B) involved dishonesty or false statement (regardless of punishment). . . .

**36.** The plea lacks the finality of a conviction because, before sentencing, it may be withdrawn for any reason that is "fair and just." Taylor v. United States, D.C.App., 366 A.2d 444, 447 (1976) (per curiam) (emphasis omitted); see Kercheval v. United States, 274 U.S. 220, 224, 47 S.Ct. 582, 583, 71 L.Ed. 1009 (1927). In contrast, after sentencing, the court will apply a stricter standard and permit a defendant to withdraw a plea only "to correct manifest injustice." Super.Ct.Cr.R. 32(e); see Taylor, supra at 447. The plea also lacks "the evidentiary basis which gives [a] verdict at least a surface guarantee of trustworthiness." United States v. Klein, 560 F.2d 1236, 1241 (5th Cir.1977), cert. denied, 434 U.S. 1073, 98 S.Ct. 1259, 55 L.Ed.2d 777 (1978). Here, for example, complainant's testimony raises doubt concerning her guilt despite her plea. It is unclear whether complainant actually possessed a weapon or was covering up for her cousin.

**37.** We need not address the question whether Crawford v. United States, supra 59 U.S.App. D.C. at 357, 41 F.2d at 980 compels us to treat a jury verdict of guilty in the same way that we treat a plea of guilty, compare Klein, supra at 1240–41, because resolution of this question would not affect our disposition.

for her return and no social inquiry was ever made. The trial court properly concluded that the New York court's oral determination that complainant might be placed on probation, depending on the outcome of a social inquiry, did not constitute a conviction or a sentence.[38] The court did not err in prohibiting the impeachment of complainant with her New York criminal record.

Accordingly, we affirm appellant's convictions for pandering and procuring.

*Affirmed.*

**38.** D.C.Code 1973, § 14–305(c) contemplates presentation of some formal documentation of a conviction:

> For purposes of [section 14–305] to prove conviction of crime, it is not necessary to produce the whole record of the proceedings containing the conviction, but the certificate, under seal, of the clerk of the court wherein the proceedings were had, stating the fact of the conviction and for what cause, shall be sufficient.